UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TRACEY DOUGLAS,

                                 Plaintiff,

-vs-

ANTHONY ANNUCCI, THERESA KNAPP-DAVID,
EDWARD BLY, JOSEPH BELLNIER, RICHARD
ROYy, JOYCE CARVER-JORDAN,

                                 Defendants.

_____

DECISION and
ORDER

14-CV-6018 CJS

## INTRODUCTION

Tracey Douglas ("Plaintiff"), formerly an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brought this action pursuant to 42 U.S.C. § 1983 ("Section 1983") maintaining that the defendants, all supervisory officials employed by DOCCS, violated his federal constitutional rights by failing to protect him from attack by other inmates who were members of the Bloods street gang ("the Bloods"). Now before the Court is a motion for summary judgment (ECF No. 39) by defendants Anthony Annucci ("Annucci"), Theresa Knapp-David ("Knapp-David"), Edward Bly ("Bly"), Joseph Bellnier ("Bellnier"), Richard Roy ("Roy") and Joyce Carver-Jordan ("Carver-Jordan"). For the reasons discussed below the application is granted and this action is dismissed.

## BACKGROUND

Unless otherwise indicated the following are the facts of the case viewed in the light most-favorable to Plaintiff. At all times relevant to this lawsuit, Plaintiff was serving a sentence of twenty-years-to-life after being convicted of Robbery in the First and

Second Degrees..[1]   Significantly, Plaintiff alleges that the victim of such robbery was the girlfriend of a high-ranking Bloods gang member.  Because of that, Plaintiff maintains, the Bloods targeted him for retaliation by putting a state-wide contract on his life within the DOCCS system:

> It's actually called a worldwide.  That's what gangs call a worldwide.  That means like your name been added to a document that anywhere you go in the state you're going to get hit.  Anywhere you go.  It doesn't make a difference where you go, you're going to get hit, you know.  So that's what we call a contract.

Pl. Dep. at p. 78.   Plaintiff maintains that this put his life at significant risk, since there are Bloods members in every single prison within DOCCS:

> Q. [A]re the Bloods in every facility across the state?
>
> A. Yes.
>
> ****
>
> Q. So what I wanted to learn about is the Bloods from what you know are in every facility across the state?
>
> A. Every facility.  The Commissioner will tell you that.  Every facility – every facility.  We're talking this is one of the most organized and biggest gangs that [DOCCS] probably has ever seen ever.

Pl. Dep. at pp. 31-32.

Plaintiff, who at all relevant times had been classified by DOCCS as a maximum-security inmate, contends that subsequently, between 2001 and 2008, he was attacked and slashed in the face by Bloods members on five separate occasions at the following DOCCS facilities: Riker's Island ("Rikers"), Downstate Correctional Facility ("Downstate"),

---

[1] That sentence was at least Plaintiff's third bid in state prison, and during a prior term of incarceration he had been stabbed multiple times by another inmate during a fight. Plaintiff's Deposition ("Pl. Dep.") at p. 54.

Elmira Correctional Facility ("Elmira"), Auburn Correctional Facility ("Auburn") and Wende Correctional Facility ("Wende").[2]   The last such attack occurred in 2008, at Wende.

Despite maintaining that Bloods members are in every DOCCS facility, Plaintiff insists that he was particularly at risk in certain maximum-security facilities where the inmates were "predominantly Bloods," namely, Attica Correctional Facility ("Attica"), Clinton Correctional Facility ("Clinton"), Five Points Correctional Facility ("Five Points"), Coxsackie Correctional Facility ("Coxsackie"), Great Meadow Correctional Facility ("Great Meadow"), Upstate Correctional Facility ("Upstate"), Southport Correctional Facility ("Southport"), Green Haven Correctional Facility ("Green Haven"), Shawangunk Correctional Facility ("Shawangunk"), Auburn, Elmira and  Wende.[3]

On the other hand, Plaintiff maintains that he was not at risk from Bloods members at Downstate, even though he had previously been attacked there by a Bloods member, or at Eastern Correctional Facility ("Eastern"), Sing Sing Correctional Facility ("Sing Sing") and Sullivan Correctional Facility ("Sullivan").  In other words, Plaintiff maintains that he "felt safe" at just four maximum-security facilities-- Downstate, Eastern, Sing Sing and Sullivan—even though they also contained Bloods members.[4]  Plaintiff's rationale is that those four facilities purportedly were "like honor facilities, more like," at which inmates were less willing to engage in criminal activities.[5]  Defendants, on the other hand, point out that those facilities are the maximum-security facilities closest to the New York City area, and suggest that Plaintiff, who is from New York City, really just wanted to be at a

---

[2] Rikers is a city jail, while the other four facilities are maximum-security prisons.
[3] Pl. Dep. at pp. 33-35.
[4] Pl. Dep. at p. 39 ("Q. So it sounds like there were four facilities that you felt acceptable to being transferred to, correct?  A. Yes.  Yes.").
[5] *Id*. at 39-40.

facility that was close to his home and family.

As mentioned earlier, Plaintiff was last attacked by Bloods gang members in 2008. Five years after that, in or about early 2013, Plaintiff was housed at Great Meadow, and was caught smoking marijuana, for which he received a disciplinary sentence that he served in the Special Housing Unit ("SHU") at Southport.[6]

While still in SHU at Southport,[7] Plaintiff sent letters to various DOCCS officials, insisting that his life was still in danger from the Bloods "contract" (despite the lack of any attack since 2008) and requesting that, upon his release from SHU, he not be transferred to any of the purported "Bloods majority" facilities, which he identified in his letters as being Clinton, Wende, Great Meadow, Elmira, Auburn, Attica, Coxsackie, Five Points and Upstate.  In response to those letters, a DOCCS official advised Plaintiff to express his concerns to officials at Southport, as will be discussed further below.

On or about July 5, 2013, Plaintiff was released from SHU and transferred to Elmira, contrary to his request.  During his first month at Elmira, Plaintiff was classified as being in general population, but he actually remained in his cell the entire time, since the facility was locked down.  Then, on August 1, 2013, Plaintiff was placed in protective custody at Elmira.  Thereafter, and until Plaintiff was transferred out of Elmira on or about January 16, 2015, he remained in protective custody.  Plaintiff admits that he felt safe in the protective custody area at Elmira.  However, Plaintiff was required to walk through an area of Elmira's general population twice per day, to receive his medications at a medical

---

[6] Plaintiff asserts that he smoked the marijuana openly, so that he would be caught and sent to SHU, where he would feel more secure.  Based on the reports that the Court has heard from inmates over the years about the conditions at Southport, the Court finds this explanation dubious.  However, the Court does not make credibility findings on a summary judgment motion.

[7] The Court takes judicial notice of the fact that Southport is an all-SHU facility for inmates serving longer disciplinary sentences, at which the disciplinary inmates are essentially kept in solitary confinement.

dispensary.  Significantly, on these brief walks Plaintiff was accompanied by a corrections officer.[8]  Nevertheless, Plaintiff claims that he suffered extreme mental distress as a result of having to leave the protective custody area, since he felt that he could be attacked at any time he was in general population, even when accompanied by a corrections officer.

On August 11, 2013, Plaintiff filed an inmate grievance at Elmira, which was assigned number EL41311-13.  The grievance, though, did not mention Plaintiff having to walk through general population to receive his medications.[9]  Rather, the grievance asserted only that DOCCS officials were "continu[ing] to be negligent towards [Plaintiff's] safety" by transferring him to Elmira, and requested only that he be transferred to a different facility. *See*, Grievance EL41311-13 ("I am filing this grievance because I should be transferred out of this facility immediately.").

On September 16, 2013, the Elmira Inmate Grievance Review Committee ("IGRC") recommended that the grievance be granted.  Specifically, the IGRC response stated in pertinent part:

> Grievance Issue:  Grievant complains in a grievance authored on 8/11/13 Grievant states that on 7/5/13 he gave constructive notice to Officials of the New York State DOCCS in Albany about being transferred to certain facilities, Elmira being one of them.  That his life was in danger in not transferred. [sic]
>
> Action Requested:  Grievant would like to be transferred to another facility where his life is not in danger.
>
> Investigative Report:  As per the investigative report of: T. Sweet.  "Inmate Douglas was approved VPC [voluntary protective custody] on 8/6/13 and was put in for a transfer to another facility on 8/13/13 as of this date his transfer is still pending."

---

[8] *Id*. at 47, 49-51.
[9] The grievance lists Plaintiff's cell location as being in protective custody.

> <u>I.G.R.C. Response:</u>   It is the recommendation of the IGRC that this grievance is: GRANTED.  Grievant was put in for transfer and is awaiting a suitable facility.

Levine Decl., Ex. B.

However, for reasons that are not stated in the record, the proposed transfer to a different facility never subsequently materialized.  Thereafter, on October 27, 2013, Plaintiff wrote a letter to the Inmate Grievance Program Supervisor ("IGPS"), asserting that he had appealed the IGRC determination and never received a response, and implying that corrections staff at Elmira must have purloined his mail.[10] Plaintiff requested that the IGPS send him a copy of any decision from the Central Office Review Committee ("CORC").  Plaintiff, though, did not indicate, either in his letter to the IGPS or in his filings in this action, the basis for such alleged appeal. (The absence of an explanation on that point is curious, since it does not seem likely that Plaintiff would have appealed the determination, inasmuch as it was favorable to him.)  Nor did Plaintiff indicate that he had filed any intermediate appeal to the facility superintendent, which ordinarily would have preceded an appeal to CORC.[11]  Moreover, Plaintiff, who keeps meticulous records, has no documentary evidence that he appealed the IGRC determination.  Nevertheless,

---

[10] Levine Declaration, Exhibit E.

[11] *See, Dabney v. Pegano*, 604 F. App'x 1, 3 (2d Cir. 2015) ("Plaintiff was required to submit his grievances through the New York DOCCS' Inmate Grievance Program ("IGP"). The IGP has a three-tiered process for adjudicating complaints: "(1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ('IGRC'), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Office Review Committee ('CORC').").  Plaintiff's statement to the IGPS, suggesting that corrections staff must have interfered with his legal mail and requesting a copy of any decision from CORC, suggests that if Plaintiff actually filed an appeal, he mailed the appeal directly to CORC without first appealing to the facility Superintendent, which would not have been the correct procedure. (CORC apparently has no record of receiving such an appeal.) Moreover, it is odd that Plaintiff would have requested a copy of CORC's decision from the facility IGPS, rather than writing directly to CORC.

Plaintiff baldly asserted to the IGPS that he had filed an appeal.  On December 27, 2013, the IGPS responded to Plaintiff, stating:

> The IGRC response to this grievance was sent to you 9/17/13.  We did not receive any further correspondence from you regarding this grievance.  The grievance was not appealed further and it is past the time frame for any further appeal.

Levine Decl., Ex. E.

On January 10, 2014, Plaintiff commenced this action proceeding *pro se*, asserting claims under Section 1983 relating to all the various attacks against him by Bloods members.  In particular, the Complaint alleged that Defendants had violated Plaintiff's Eighth Amendment rights by failing to protect him on the occasions when he had actually been attacked, and by subsequently placing him at Elmira where he still feared attack despite being in protective custody.  The Complaint demanded injunctive relief, compensatory damages and punitive damages, and sued officials at Elmira as well as DOCCS officials in Albany.

However, following a significant amount of motion practice, most of Plaintiff's claims were dismissed.[12]  More specifically, the Court first dismissed (without prejudice) all claims against officials at Elmira after Plaintiff failed, in response to the Court's initial screening Order, to explain the factual basis for such claims. *See*, ECF Nos. 4-6. Subsequently, all claims relating to the attacks on Plaintiff between 2001 and 2008 were dismissed, *see*, Decision and Order (ECF No. 12),[13] leaving only the claim involving the transfer of Plaintiff to Elmira in 2013.  As to that claim, the Court denied Plaintiff's request

---

[12] *See*, ECF Nos. 12 (Order granting partial summary judgment), 12 (Decision and Order denying preliminary injunctive relief), 23 (Order denying motion for reconsideration) and 24 (Decision and Order granting partial dismissal).

[13] Plaintiff successfully recovered damages for those attacks in actions filed in the New York Court of Claims.

for preliminary injunctive relief (Plaintiff is presently on parole) (ECF No. 21) and dismissed his claim for compensatory damages since he did not sustain any physical injury. *See*, Decision and Order (ECF No. 24). However, the Court ruled that despite the lack of physical injury, Plaintiff could nevertheless proceed, at the pleading stage, on an Eighth Amendment "failure to protect claim" and, if successful, could possibly recover nominal and punitive damages. *Id.*

Defendants subsequently filed the subject motion for summary judgment (ECF No. 39) and gave Plaintiff the required *Irby* notice. As to the remaining Eighth Amendment failure-to-protect claim, Defendants maintain they are entitled to summary judgment on the following grounds: 1) failure to exhaust administrative remedies before commencing this action as required by § 1997e(a); 2) lack of personal involvement by any Defendant in the alleged constitutional violation; 3) lack of merit to the claim; and 4) qualified immunity. Alternatively, Defendants maintain that if their summary judgment motion is denied, the Court should nevertheless dismiss the claim for punitive damages, as there is no evidence of wanton, reckless or malicious conduct.

Plaintiff filed a response (ECF No. 44) in opposition to the motion, maintaining that there are "numerous" triable issues of fact. In particular, Plaintiff maintains that he exhausted his administrative remedies to the extent possible, and that "the correctional staff at Elmira" interfered with his ability to do so by "interfering with the incoming and outgoing mail." Plaintiff also contends that Defendants were personally involved in the alleged constitutional violation, since he wrote letters to them describing his situation. On this point, although Plaintiff previously indicated that he was pursuing an Eighth Amendment claim, *see*, Complaint at pp. 10-12, he now asserts for the first time that

Defendants also violated his rights to "due process and equal protection," which only requires that they "knew or should have known" of a condition that posed an excessive risk to his health or safety. Plaintiff further maintains that he can establish both the objective and subjective prongs of an Eighth Amendment failure-to-protect claim, and that Defendants are not entitled to qualified immunity. Finally, Plaintiff contends that the punitive damages claim should not be dismissed.

The Court notes that Plaintiff's opposition consists of seven-page "Brief in Opposition" (ECF No. 44) and a two-page sworn "Declaration in Opposition" (ECF No. 44-1). Although Plaintiff maintains that he was prevented from exhausting his administrative remedies by unknown staff at Elmira, his declaration contains no sworn allegations concerning his alleged filing of an appeal from the IGRC's determination.

The Court has considered the parties' submissions and the entire record.

APPLICABLE LEGAL PRINCIPLES

<u>Plaintiff's *Pro Se* Status</u>

Plaintiff is proceeding *pro se*. Accordingly, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

<u>Rule 56</u>

Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56. Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress &*

9

*Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

<u>Exhaustion of Administrative Remedies</u>

Inmates and pretrial detainees are required to exhaust administrative remedies *before* asserting a federal claim in federal court complaining about jail or prison conditions. *See*, 42 U.S.C.A. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). However, despite this general requirement,

> [p]risoners are exempt from the exhaustion requirement when administrative remedies are unavailable. An administrative procedure is unavailable when (1) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is so opaque that it becomes, practically speaking, incapable of use; or (3) prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Amaker v. Bradt*, 745 F. App'x 412 (2d Cir. Dec. 19, 2018) (citations and internal quotation marks omitted).

If administrative remedies were "available" to the inmate plaintiff, then he must have "properly" exhausted his remedies:

> Proper exhaustion demands compliance with a prison grievance system's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

*Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90-91, 126 S.Ct. 2378 (2006), internal quotation marks omitted).

Proper exhaustion also requires that inmate's grievance put prison officials on notice of the same claim that is being asserted in the federal lawsuit. *See, Gomez v. Dep't of Correction*, No. 3:20-CV-958 (JAM), 2022 WL 788261, at *3 (D. Conn. Mar. 15, 2022) ("Even if a prisoner has availed himself of the prison grievance process, the Second Circuit has held that a prisoner does not exhaust his administrative remedies unless his grievance 'allege[s] facts sufficient to alert corrections officials to the nature of the claim.' *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012). Because the

exhaustion requirement is intended to afford prison officials an opportunity to address the issue internally, the inmate must include sufficient information to enable prison officials to address the same claim asserted in federal court.") (citation omitted); *see also, Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) ("While this Court has found it appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally.").

Here, in response to Defendants' contention that Plaintiff failed to exhaust his administrative remedies, Plaintiff has indicated, though not in a sworn statement, that he filed an appeal of the IGRC's determination of Grievance No. EL42009-14. In particular, Plaintiff indicates that he mailed an appeal to CORC, and that insofar as CORC has no record of receiving it, it is because staff at Elmira prison thwarted his efforts by pulling the appeal out of the mail.

The Court indicated above several reasons why it seems highly unlikely that Plaintiff actually filed such an appeal. Consequently, it seems much more plausible that as Plaintiff was preparing his complaint in this action, he realized that he had not exhausted his administrative remedies and accordingly drafted the letter to the IGPS asking about a decision on a non-existent appeal. However, the Court may not resolve issues of credibility on a summary judgment motion.

Nevertheless, the Court finds that Plaintiff has not created a triable issue of fact as to whether he exhausted his administrative remedies before filing this action as required by § 1997e(a). To begin with, Plaintiff has not provided a sworn statement concerning his alleged attempt to file an appeal. More importantly, even assuming that

the Court accepts Plaintiff's unsworn statements as true, his description of his attempt to appeal the IGRC decision does not amount to proper exhaustion under New York's Inmate Grievance Program procedures.  That is, Plaintiff contends that upon receiving the IGRC's determination, he mailed an appeal to CORC.  However, as mentioned above in footnote 11, the proper response to the IGRC's decision would have been to first file an appeal with Elmira's superintendent, and then file an appeal to CORC.  There is no indication in the record that Plaintiff filed an appeal to the facility superintendent, and consequently he has not raised a triable issue of fact as to whether he properly exhausted his administrative remedies.

Additionally, even assuming that Plaintiff's attempt to appeal was otherwise sufficient, the only thing about which Plaintiff complained in his grievance was the fact that he had been transferred to Elmira, which placed him in danger because he had enemies in the Bloods gang.  Moreover, the only relief that Plaintiff requested in the grievance was to be transferred to a different facility.  The grievance did not mention the fact that even though Plaintiff was in protective custody, he feared for his safety because he had to go into general population to receive his medications.  Nor did the grievance request any relief related to that concern, such as that he be allowed to receive his medications without having to leave the protective custody area of the facility.

Consequently, the grievance did not put officials at Elmira on notice of the primary claim remaining in this action– the claim that Defendants were deliberately indifferent to Plaintiff's safety by requiring him to leave the protective custody area and walk through general population to receive his medications, accompanied by a

corrections officer.  The grievance gave no indication that Plaintiff had a medical condition that would require him to leave the protective custody area of the facility and enter general population to receive medication.   Rather, the grievance only gave notice of the claim that DOCCS had put Plaintiff at risk of injury or death by transferring him to Elmira (even though they subsequently placed him in protective custody).

In sum, the Court finds that Defendants are entitled to summary judgment based on Plaintiff's failure to properly exhaust administrative remedies. The Court further finds that even assuming Plaintiff had properly exhausted grievance EL42009-14, the grievance only put DOCCS on notice of a claim that Plaintiff believed he was generally in danger at Elmira and wanted a transfer, and did not give notice that Plaintiff was in danger from having to leave the protective custody area to receive his medications.  As discussed below, the Court also finds that Plaintiff's claims against Defendants lack merit in any event.

### Section 1983

Section 1983 "is not itself a source of a substantive rights, but merely provides a method for vindication of federal rights elsewhere conferred." *Long v. Crowley*, No. 09BCVB00456A(F), 2012 WL 1202181 (W.D.N.Y. Mar. 22, 2012) (citations and internal quotation marks omitted). To establish individual liability under Section 1983, a plaintiff must show that the defendant acted under color of state law and caused the plaintiff to be deprived of a constitutional right. 42 U.S.C. § 1983.

#### Personal Involvement

"A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority. Rather, the

personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (citations and internal quotation marks omitted), as amended (Feb. 24, 2016).  Personal involvement of a supervisory defendant may be shown by evidence that:

> "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal citations omitted).

Receiving and forwarding an inmate's correspondence is insufficient to establish personal involvement by a prison official. *See, Delee v. Hannigan*, 729 F. App'x 25, 31 (2d Cir. 2018) ("As to defendant Chappius, the amended complaint makes the single allegation that he had forwarded correspondence from Delee to another party. Such activity, without more, does not amount to personal involvement. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997)."); *see also, Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir. 2010) ("The record shows that Dr. Wright's personal involvement was limited to the receipt of two letters from Goris, which he promptly referred to other individuals for investigation and response. Accordingly, Goris has failed to establish the requisite personal involvement on Dr. Wright's part, and the district court properly granted summary judgment in Dr. Wright's favor.") (citation omitted).

In the instant case, the record shows that the remaining defendants (Annucci, Knapp-David, Bly, Bellnier, Roy and Carver-Jordan) are all supervisory DOCCS officials

to whom Plaintiff sent letters.  Plaintiff has not shown that any such defendant was actually involved in the decision to transfer him to Elmira, or in the decision to require him to leave Elmira's protective custody area each day and walk through general population to receive his medications.  The record indicates, instead, that the decision to transfer Plaintiff to Elmira was made by officials at Southport and/or Elmira, with some oversight by unnamed DOCCS officials at the Division of Classification and Movement in Albany.  The record further suggests that the decision to require Plaintiff to leave protective custody at Elmira to receive his medications, while being escorted by a corrections officer, was made by someone at Elmira.  Plaintiff initially sued several DOCCS employees at Elmira.  However, the Court dismissed those defendants from the action without prejudice after Plaintiff failed to explain how they were personally involved in the claim, and Plaintiff never subsequently amended the Complaint to add those defendants back into the action.

As for Annucci, Knapp-David, Bly, Bellnier, Roy and Carver-Jordan, the record[14] indicates that in or about March 3, 2013, while Plaintiff was still in SHU at Southport, he sent a letter to these Defendants requesting that he not be transferred to Clinton, Wende, Great Meadow, Elmira, Auburn, Attica, Coxsackie, Five Points or Upstate.  On April 9, 2013, Plaintiff sent a similar letter to Carver-Jordan, in her capacity as DOCCS Director for Classification and Movement.  On April 30, 2013, Associate Commissioner Knapp-David wrote to Plaintiff stating:

> [DOCCS] Commissioner [Brian] Fischer has referred your recent correspondence regarding separatees, to me for response.  The Office of Classification and Movement reviews an offender's transfer history and the separation system prior to issuing a transfer order.  Be assured this procedure will be utilized prior to your transfer being considered.  You should discuss any future transfer issues with your assigned Offender

---

[14] *See, e.g.*, ECF No. 5 and exhibits.

Rehabilitation Coordinator, who is in the best position to advise you regarding such matters.

ECF No. 5, Exhibits.  On May 1, 2013, Plaintiff sent another such letter to several DOCCS officials including DOCCS Commissioner Fischer and defendants Annucci and Carver-Jordan.   On May 9, 2013, defendant Bly, Assistant DOCCS Commissioner, wrote to Plaintiff, evidently in response to Plaintiff's letter of May 1, 2013, stating:

> Assistant Commissoner/Executive Assistant Van Buren has asked me to respond to your letter to her regarding your safety and your transfer concerns at Southport Correctional Facility.
>
> Your letter was sent to Superintendent Griffin for investigation who reported the facility investigated these matters in response to similar complaints you filed with his office.  Facility officials answered you on April 2, 2013, indicating inmates were added to your separatee list.
>
> All transfers are initiated at the facility level and are subject to review by the Division of Classification and Movement in Albany.  Therefore, it is suggested you continue to discuss your transfer concerns with your assigned offender rehabilitation coordinator.  If a transfer is submitted on your behalf, it will be evaluated thoroughly and appropriate action will be taken if warranted.
>
> I am confident that facility officials have taken and will continue to take the necessary preventative measures to ensure your safety.  However, in the future, if you feel that there are specific individuals that pose a threat, you should immediately notify facility officials as they are in the best position to evaluate your concerns and take appropriate action.

ECF No. 5, Exs.  Also, on June 27, 2013, Knapp-David sent a letter to Plaintiff's fiancé, Charlotte Pugh, apparently in response to a letter she had received from Pugh, stating:

> Acting Commissioner Annucci has referred your correspondence regarding separatees of your fiancé, Tracey Douglas, to me for response.
>
> The Office of Classification and Movement reviews an offender's transfer history and the separation system prior to issuing a transfer order.  Be

assured this procedure was utilized prior to Tracey's transfer being approved.

Your fiancé has been approved for transfer. Movement will be effected when appropriate space becomes available.

ECF No. 5, Exs.

After being transferred to Elmira, Plaintiff continued to write letters to DOCCS officials. Notably, in that regard, on November 4, 2013, and November 7, 2013, Plaintiff wrote letters to Defendants in this action, stating that he did not feel safe at Elmira even though he was in protective custody. ECF No. 5, Exhibits. In his letter dated November 4, 2013, Plaintiff stated that despite him being in protective custody, there was still "the possibility of imminent danger everytime [he was] forced to walk through the general population of inmates in order to go get [his] pain medication twice a day," and that the fact he was escorted by a corrections officer on each such trip was "irrelevant." *Id*. Plaintiff stated essentially the same things in his letter dated November 7, 2013. *Id*. ("My life is in jeopardy here even in the protective custody unit where I am now held, there are threats to my security, due to the fact that I have to go (twice a day) to a medication window in the facility infirmary to receive my [medication]."). Both letters asserted that Plaintiff was living in a constant state of fear of being attacked. Except as indicated above, there is no indication that any Defendant received or responded to Plaintiff's letters.

On these facts, the Court finds that there is no triable issue of fact as to Defendants' personal involvement in the alleged constitutional violations. The only Defendants who responded to Plaintiff's letters were Knapp-David and Bly, and their involvement took place while Plaintiff was still at Southport. At that point, Plaintiff had yet to be transferred to Elmira. Moreover, it would have been reasonable for Defendants to believe that even

if Plaintiff had been transferred to one of the facilities listed in his letters, he would have been placed in protective custody or otherwise kept away from his enemies through existing DOCCS procedures. Consequently, it cannot be said that Knapp-David or Bly (or any other Defendant who might have received Plaintiff's letters) had notice at that time of any violation of Plaintiff's constitutional rights.

As for the letters that Plaintiff wrote to Defendants in November 2013, the Court similarly finds that they are not sufficient to demonstrate personal involvement in an alleged constitutional violation. Those letters indicate that Plaintiff was in protective custody at Elmira, and that whenever he left the protective custody area he was escorted by a corrections officer. While Plaintiff asserted that he still felt unsafe whenever he had to go to receive his medications, Plaintiff's subjective feelings in that regard do not raise a triable issue of fact as to whether Defendants had reason to believe that a constitutional violation was occurring, such that they could be deemed to have personal involvement under the *Colon v. Coughlin* standard set forth above.

Accordingly, Defendants are entitled to summary judgment based on a lack of personal involvement in the alleged constitutional violations. The Court further finds that Plaintiff's claims lack merit, as discussed below.

<u>Eighth Amendment</u>

It is law of the case that Plaintiff's Complaint, liberally construed, purports to state an Eighth Amendment failure-to-protect claim.[15] That claim has two facets: First, that Defendants failed to protect Plaintiff from physical harm by transferring him to Elmira

---

[15] As mentioned earlier, in his opposition to Defendants' summary judgment motion Plaintiff indicates that he is also asserting a due process and equal protection claim, and that he is therefore not required to demonstrate deliberate indifference. Plaintiff's attempt to amend his Complaint in that fashion is denied as, *inter alia*, untimely.

against his wishes; and, second, that Defendants failed to protect Plaintiff from mental and physical harm at Elmira by requiring him to walk through the general population area to receive his medications each day, accompanied by a corrections officer.

The Eighth Amendment protects prison inmates against cruel and unusual punishment. U.S. Const. amend. VIII; *see Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (protecting inmates against the "unnecessary and wanton infliction of pain") (internal quotation marks omitted). To be actionable, the punishment must be "objectively, sufficiently serious," and the corrections officer must have a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation and internal quotation marks omitted).

A bare allegation that a prison official acted with the requisite mental state is insufficient to withstand summary judgment. *See, Delee v. Hannigan*, 729 F. App'x  at 32 (2d Cir. 2018) ("Delee alleges that a number of other supervisory defendants exhibited deliberate indifference to his purported constitutional deprivations; but he provides no evidence that any of them had the requisite mental state or knowledge. *See Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. Such bare allegations are insufficient to withstand summary judgment. *See* Fed. R. Civ. P. 56; *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).").

"To state a claim for deliberate indifference to health or safety or failure to protect him from harm, [an inmate] must show that the conditions of his confinement posed a substantial risk of serious harm and that the defendants were deliberately indifferent to his safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Deliberate indifference exists when the defendant knows of and disregards an excessive risk to the plaintiff's

safety. *See id*. at 837; *Bridgewater v. Taylor*, 698 F. Supp. 2d 351, 357 (S.D.N.Y. 2010) (explaining that defendants must be aware of facts supporting an inference that harm would occur and must actually draw that inference).”). *Pena v. Cook*, No. 3:19-CV-825 (KAD), 2019 WL 2579262, at *3 (D. Conn. June 24, 2019).

“In order to prevail on an Eighth Amendment claim based on a prison official's ‘deliberate indifference’ to a substantial risk of serious harm, a plaintiff must show not only that the harm is sufficiently serious, but that the defendant acted with a sufficiently culpable state of mind, and was not merely negligent.” Doyle v. Coombe, 159 F.3d 1346 (table), 1998 WL 537066 at *2 (2d Cir. Jun. 12, 1998).  It is possible for an inmate to show “a substantial risk of serious harm” even though he did not sustain actual harm, but in “most cases” the absence of any injury will be “highly relevant to the question of whether the [defendant] subjected the prisoner to a significant risk of serious harm.”  *Hall v. New York*, 476 Fed.Appx. 474, 477, 2012 WL 1003765 at *2,  n. 1 (2d Cir. Mar. 27, 2012).  On this point, courts have held that the mere fear of being assaulted by other inmates is insufficient to establish a substantial risk of objective harm. *See, e.g., Cooper v. City of New York*, No. 13–cv–7590 (PKC)(JLC), 2014 WL 5315074 at *3 (S.D.N.Y. Oct. 17, 2014) (“While an actual physical attack is not required to demonstrate a substantial risk of serious harm, mere fear of an assault is insufficient to state a claim for an Eighth Amendment violation.”).

Here, Plaintiff has not raised a triable issue of fact as to either the objective or subjective prongs of an Eighth Amendment failure-to-protect claim.  Insofar as Plaintiff's claim is based on the fact that he was transferred to Elmira, it fails since the transfer did not objectively create an excessive risk to his safety.  Plaintiff maintains that the Bloods

had placed a DOCCS-wide contract on his life, and that Bloods members are at every single DOCCS facility.   Consequently, the fact that Plaintiff was sent to Elmira, as opposed to one of the other facilities where he subjectively felt safer (such as Downstate, even though he was previously attacked there by the Bloods) did not necessarily place him at greater risk.  Moreover, prior to the transfer DOCCS officials attempted to identify all of Plaintiff's known enemies, and after the transfer they placed him in protective custody.  Nor, on these facts, has Plaintiff shown that defendants subjectively acted with deliberate indifference to his safety by transferring him to Elmira.

Insofar as the claim is based on Plaintiff having to leave the protective custody area at Elmira to receive his medications, it similarly fails, since there objectively was no excessive risk to Plaintiff's safety, and no deliberate indifference to such a risk, where he was always escorted by a corrections officer.  The fact that Plaintiff still subjectively feared for his safety under those circumstance, or that officials at Elmira might have taken even greater precautions, does not raise a triable issue of fact as to whether DOCCS officials acted with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."); *see also, Jones v. Diaz*, No. 09 CIV. 2625 SHS, 2011 WL 1202024, at *3 (S.D.N.Y. Mar. 23, 2011) ("There is no indication in the record of these litigations that the WCDOC defendants knew Jones was facing a substantial risk of serious harm when they escorted him down the hallway past other inmates. When Chambliss unforeseeably assaulted plaintiff, the escorting officer—and ultimately the Emergency Response Team—intervened to break up the fight. The fact

that the WCDOC defendants could have taken additional precautions to prevent the altercation is insufficient to prove deliberate indifference, a level of culpability higher than mere negligence.  Accordingly, plaintiff has failed to raise a genuine issue of material fact and summary judgment on plaintiff's failure to protect claim should be granted in favor of the WCDOC defendants as a matter of law.") (citation omitted).  At most, the failure to take additional precautions would amount to negligence, not deliberate indifference.

## CONCLUSION

Defendants' motion for summary judgment (ECF No. 39) is granted and this action is dismissed.  The Clerk of the Court is directed to enter judgment for Defendants and close this action.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

Dated: Rochester, New York
        June 27, 2022

ENTER:

CHARLES J. SIRAGUSA
United States District Judge